IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| MARCO MERRANDO JACKSON, | ) | 8:15CV93 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **MEMORANDUM** |
| | ) | **AND ORDER** |
| NEBRASKA DEPARTMENT OF | ) | |
| CORRECTIONS, et al., | ) | |
| | ) | |
| Defendants. | ) | |

Plaintiff Marco Merrando Jackson filed his Complaint on March 12, 2015. The court conducted a pre-service screening of the Complaint on July 6, 2015, and in doing so, it ordered Jackson to file an amended complaint that states a claim for relief against a defendant who is not immune from suit. (Filing No. 11.)

Plaintiff filed an Amended Complaint (Filing No. 12) on August 4, 2015. The court now conducts an initial review of Jackson's Amended Complaint to determine whether summary dismissal is appropriate under 28 U.S.C. §§ 1915(e)(2) and 1915A. For the reasons discussed below, the court will not allow this case to proceed to service of process.

### I. SUMMARY OF AMENDED COMPLAINT

Jackson is currently incarcerated at the Lincoln Correctional Center ("LCC") in Lincoln, Nebraska. His claims are based on incidents that occurred in Lincoln, Nebraska, at the LCC, and also at the Lancaster County Jail and the Diagnostic and Evaluation Center ("DEC"). Jackson asserts Eighth Amendment claims brought pursuant to 42 U.S.C. § 1983 against numerous defendants, but most are never mentioned in Jackson's allegations. The three defendants who are mentioned in Jackson's allegations include Catherine Pallas (a prison doctor), Chrissy Benson (a prison nurse), and Fred Britten (a prison warden).

Jackson provided an exhaustive, diary-like account of his medical needs and the medical treatment he received while incarcerated at the above-mentioned facilities between April of 2014 and March of 2015. (Filing No. 12.) His factual allegations span more than 50 pages. The court will generally summarize Jackson's allegations in the paragraphs that follow, being careful to include those allegations that specifically pertain to Pallas, Benson, and Britten.

Jackson injured his knee and ankle while playing basketball at the Lancaster County Jail in April or March of 2014. He remained in this jail until September 4, 2014. During this time, a jail nurse and a jail doctor examined Jackson on two separate occasions and they both stated Jackson had likely torn a ligament in his right knee. In the days following Jackson's injury, jail staff provided Jackson with an ice pack, a lower-bunk pass, and they placed him on 30-day yard/recreation restriction. (Filing No. 12 at CM/ECF pp. 5-9.) In addition, in response to Jackson's questions, the above-mentioned jail doctor explained that a torn ligament was not an emergency and Jackson would not be immediately taken to the hospital for surgery or for an MRI. This doctor also explained Jackson would have to wait until he began serving his prison sentence in the state system to have his knee repaired. (Filing No. 12 at CM/ECF pp. 9-10.)

On September 4, 2014, Jackson's custody was transferred to the DEC, where he resided until November 3, 2014. During this time, medical personnel examined Jackson at least three times in response to his complaints of knee, hip, and back pain. At these appointments, they prescribed a knee sleeve and pain medication. (Filing No. 12 at CM/ECF pp. 18-23.) In addition, Pallas ordered an x-ray of Jackson's knee and referred him to an orthopedist, but advised him he could not have surgery until his transfer to a permanent correctional facility. (Filing No. 12 at CM/ECF pp. 21-22.)

On November 3, 2014, Jackson's custody was transferred to the LCC, where he remains incarcerated at this time. An orthopedist examined Jackson's knee on November 17, 2014, and diagnosed him with a torn ACL. He explained surgery would be required to alleviate the pain in Jackson's knee. Jackson underwent surgery more

than four months later on March 13, 2015. (Filing No. 12 at CM/ECF pp. 12, 24-25.) While unclear, it appears from Jackson's allegations there may have been some delay in scheduling his surgery because the surgeon originally scheduled to perform the surgery had been suspended from practicing medicine. (*See* Filing No. 12 at CM/ECF p. 30.)

In the four months leading up to Jackson's surgery, Jackson complained numerous times about the delay in scheduling his surgery, and about his ongoing knee, hip, and back pain. (Filing No. 12 at CM/ECF pp. 25-43.) In response, prison medical staff examined him on at least three occasions (Filing No. 12 at CM/ECF pp. 27-28, 32), and a chiropractor treated him on at least two occasions (Filing No. 12 at CM/ECF pp. 25, 37). Jackson's providers prescribed muscle relaxers, a knee sleeve, and various pain medications. (Filing No. 12 at CM/ECF p. 27-28, 33). With respect to Pallas, Jackson alleged she examined and treated him on February 13, 2015. She gave Jackson a knee sleeve, prescribed a pain medication, and referred Jackson for outside medical treatment for his back pain. (Filing No. 12 at CM/ECF p. 33.) In addition, Pallas conducted Jackson's pre-surgery screening on March 5, 2015. (Filing No. 12 at CM/ECF p. 41.)

Jackson underwent knee surgery on March 13, 2015. Following surgery, he spent nearly three weeks in the DEC's hospital for recovery, from March 13, 2015, to March 31, 2015. (Filing No. 12 at CM/ECF pp. 44, 50.) From March 13, 2015, to March 17, 2015, Jackson was held in a "suicide room" (also referred to as a "plan room") instead of a "recovery room" within the hospital. Jackson alleged that "suicide rooms" are stripped of all "essentials" and are equipped with only a rubber foam bed. (Filing No. 12 at CM/ECF p. 43.)

Jackson's "suicide room" initially had a mattress in it. But, on March 15, 2015, Benson removed the mattress, advising Jackson that the mattress was a health hazard because it was not properly secured within the room. As a result, Jackson was forced to sleep on the rubber foam bed instead of a mattress. (Filing No. 12 at CM/ECF p.

3

47.) Jackson complained about this, and the condition of the room in general, in an emergency grievance. Britten responded to the grievance by stating that the subject of the grievance was not an emergency, and that Jackson had been placed in the only licensed medical room available when he returned from surgery. (Filing No. 12 at CM/ECF p. 48.) Prison staff transferred Jackson to a "recovery room" on March 17, 2015. (Filing No. 12 at CM/ECF p. 49.) They released Jackson from the prison hospital on March 31, 2015. (Filing No. 12 at CM/ECF p. 50.)

Jackson alleges in this action that the defendants failed to provide proper medical care. For relief, Jackson seeks $500,000 in monetary damages. (Filing No. 12 at CM/ECF p. 7.)

## II. STANDARDS ON INITIAL REVIEW

The court is required to review prisoner and in forma pauperis complaints seeking relief against a governmental entity or an officer or employee of a governmental entity to determine whether summary dismissal is appropriate. *See* 28 U.S.C. §§ 1915(e) and 1915A. The court must dismiss a complaint or any portion of it that states a frivolous or malicious claim, that fails to state a claim upon which relief may be granted, or that seeks monetary relief from a defendant who is immune from such relief. 28 U.S.C. § 1915(e)(2)(B); 28 U.S.C. § 1915A(b).

Pro se plaintiffs must set forth enough factual allegations to "nudge[] their claims across the line from conceivable to plausible," or "their complaint must be dismissed." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 569-70 (2007); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.").

"The essential function of a complaint under the Federal Rules of Civil Procedure is to give the opposing party 'fair notice of the nature and basis or grounds

4

for a claim, and a general indication of the type of litigation involved.'" *Topchian v. JPMorgan Chase Bank, N.A.*, 760 F.3d 843, 848 (8th Cir. 2014) (quoting *Hopkins v. Saunders*, 199 F.3d 968, 973 (8th Cir. 1999)). However, "[a] pro se complaint must be liberally construed, and pro se litigants are held to a lesser pleading standard than other parties." *Topchian*, 760 F.3d at 849 (internal quotation marks and citations omitted).

Liberally construed, Plaintiff here alleges federal constitutional claims. To state a claim under 42 U.S.C. § 1983, a plaintiff must allege a violation of rights protected by the United States Constitution or created by federal statute and also must show that the alleged deprivation was caused by conduct of a person acting under color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988); *Buckley v. Barlow*, 997 F.2d 494, 495 (8th Cir. 1993).

## III. DISCUSSION OF CLAIMS

The court begins its discussion by noting that Jackson's official-capacity claims are barred by the Eleventh Amendment. The court previously made this determination in its pre-service screening of Jackson's Complaint. (*See* Filing No. 11.) Jackson reasserted his official-capacity claims in his Amended Complaint, but those claims remain dismissed.

Jackson also alleged Eighth Amendment claims against the defendants in their individual capacities in his Amended Complaint. For the reasons that follow, the court finds Jackson failed to state plausible claims for relief under the Eighth Amendment.

**A.      Eighth Amendment Standard**

Jackson's Amended Complaint details incidents that occurred while he was a pretrial detainee at the county jail and, later, a convicted prisoner at two state correctional facilities. The distinction makes little difference in this case because both

a pretrial detainee's and a convicted prisoner's claims of inadequate medical care are analyzed in the Eighth Circuit under the deliberate indifference standard. *See Butler v. Fletcher,* 465 F.3d 340, 344 (8th Cir. 2006).

To prevail on an Eighth Amendment claim, Jackson must prove that the defendants acted with deliberate indifference to his serious medical needs. *See Estelle v. Gamble,* 429 U.S. 97, 106 (1976). The deliberate indifference standard includes both an objective and a subjective component. Jackson must demonstrate that (1) he suffered from objectively serious medical needs, and (2) the defendants knew of, but deliberately disregarded, those needs. *See Jolly v. Knudsen,* 205 F.3d 1094, 1096 (8th Cir. 2000) (quoting *Dulany v. Carnahan,* 132 F.3d 1234, 1239 (8th Cir.1997)).

For a claim of deliberate indifference, the prisoner must show more than negligence, more even than gross negligence, and mere disagreement with treatment decisions does not give rise to the level of a constitutional violation. Deliberate indifference is akin to criminal recklessness, which demands more than negligent misconduct. *Popoalii v. Corr. Medical Servs.*, 512 F.3d 488, 499 (8th Cir. 2008).

**B.    Jackson's Allegations**

The only defendants Jackson specifically referred to in his allegations were Catherine Pallas, Chrissy Benson, and Fred Britten. A complaint that only lists a defendant's name in the caption without alleging that the defendant was personally involved in the alleged misconduct fails to state a claim against that defendant. *See Krych v. Hvass,* 83 F. App'x 854, 855 (8th Cir. 2003) (citing *Potter v. Clark,* 497 F.2d 1206, 1207 (7th Cir. 1974) (holding that court properly dismissed a pro se complaint where the complaint did not allege that defendant committed a specific act and the complaint was silent as to defendant except for his name appearing in caption)).

Jackson did not specify how Pallas, Benson, and Britten acted with deliberate indifference to his serious medical needs, and the court cannot infer any such

6

indifference from Jackson's allegations. Jackson alleged Pallas examined him on at least four occasions. On October 3, 2014, she ordered an x-ray after examining his hip and lower back. (Filing No. 12 at CM/ECF p. 21.) On October 23, 2014, she referred him to treatment by an orthopedist after examining his knee. On February 13, 2015, she prescribed Tramadol to treat Jackson's pain after he complained Ibuprofen was not effective. (Filing No. 12 at CM/ECF p. 33.)

The only discernible complaint Jackson makes with respect to Pallas appears to relate to her examination of him on March 3, 2014. On this date, Pallas conducted a pre-surgery physical in preparation for Jackson's knee surgery. Jackson alleged Pallas failed to prescribe a treatment for his back pain at this appointment, despite his complaints that he was suffering from back pain. (Filing No. 12 at CM/ECF p. 41.)

The allegations with respect to Benson and Britten relate to an incident that occurred after Jackson's knee surgery. On March 15, 2015, Benson removed the mattress from Jackson's prison-hospital room. Benson advised Jackson that the mattress was a health hazard because it was not properly secured within the room. As a result, Jackson was forced to sleep on a rubber foam bed instead of a mattress. (Filing No. 12 at CM/ECF p. 47.) Jackson complained about this, and the conditions of his prison-hospital room in general, in an emergency grievance. Britten responded to the grievance by stating that the subject of his grievance was not an emergency, and that he had been placed in the only licensed medical room available when he returned from surgery. (Filing No. 12 at CM/ECF p. 48.)

The court cannot infer from Jackson's allegations that Pallas, Benson, or Britten were deliberately indifferent to Jackson's serious medical needs. Indeed, Jackson provided a very detailed, near-daily account of his medical needs over the course of a year and jail and prison officials' responses to those needs. It is apparent from Jackson's allegations that he received extensive medical treatment after his injury. He was seen and treated repeatedly by nurses, doctors, chiropractors, orthopedists, and eventually, a surgeon. These medical providers treated him with ice packs, knee

sleeves, pain medications, muscle relaxers, lower bunk passes, scans, x-rays, and eventually, surgery. Jackson disagrees with the course of treatment and he takes issue with the amount of time it took to schedule his surgery, but he offered no facts to suggest any of the defendants were deliberately indifferent to his medical needs. Accordingly, the court will dismiss this case in its entirety for failure to state a claim upon which relief may be granted.

IT IS THEREFORE ORDERED that:

1. This case is dismissed in its entirety. Plaintiff's Eighth Amendment claims against Catherine Pallas, Chrissy Benson, and Fred Britten are dismissed with prejudice. Plaintiff's claims against the remaining Defendants are dismissed without prejudice.

2. The court will enter judgment by a separate document.

DATED this 20th day of October, 2015.

BY THE COURT:

*s/ John M. Gerrard*
United States District Judge

---

*This opinion may contain hyperlinks to other documents or Web sites. The U.S. District Court for the District of Nebraska does not endorse, recommend, approve, or guarantee any third parties or the services or products they provide on their Web sites. Likewise, the court has no agreements with any of these third parties or their Web sites. The court accepts no responsibility for the availability or functionality of any hyperlink. Thus, the fact that a hyperlink ceases to work or directs the user to some other site does not affect the opinion of the court.